UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

GREEN TECHNOLOGY LIGHTING
CORP., *a Georgia Corporation*,

     Plaintiff,

     v.

INSURE IDAHO, LLC, *an Idaho
Limited Liability Company*; CROUSE
AND ASSOCIATES INSURANCE
SERVICES OF NORTHERN
CALIFORNIA, *a California
Corporation*,

     Defendants.

Case No. 1:17-cv-00432-DCN

**MEMORANDUM DECISION
AND ORDER**

# I. INTRODUCTION

Pending before the Court is Defendant Insure Idaho's Motion for Partial Summary Judgment (Dkt. 83), Defendant Crouse and Associates Insurance Services of Northern California's Motion for Summary Judgment (Dkt. 84), and Plaintiff Green Technology Lighting Corporation's Motion to Strike (Dkt. 101). The Court held a hearing on the Motions on December 12, 2022, and took them under advisement. For the reasons stated below, the Court GRANTS Insure Idaho's Motion for Partial Summary Judgment and Crouse's Motion for Summary Judgment and DENIES Green Tech's Motion to Strike.

# II. BACKGROUND

This insurance coverage dispute began on October 16, 2017, when Plaintiff Green

MEMORANDUM DECISION AND ORDER - 1

Technology Lighting Corp. ("Green Tech") filed a complaint against Liberty Surplus Insurance Corp. and Liberty Insurance Underwriters, Inc. (collectively "Liberty"), Insure Idaho LLC, and Crouse and Associates Insurance Services of Northern California, Inc. ("Crouse"). Liberty is no longer a party to this suit.[1]

Green Tech manufactures and sells energy efficient light bulbs. In late 2015, one of Green Tech's customers sent notice that certain Green Tech light bulbs for retail sale were defective. The next year, Green Tech recalled around 400,000 light bulbs. This recall cost Green Tech over $900,000, giving rise to its claims.

This case centers on Green Tech's insurance coverage for product recalls—or lack thereof. Green Tech hired Insure Idaho, a retail insurance agency, to obtain coverage. Insure Idaho then hired Crouse, a wholesale surplus line insurance broker, to coordinate with insurers to obtain coverage for Green Tech.

While Green Tech had a product recall *expense* policy through Liberty, it did not have a product recall *liability* policy. Though only one word distinguishes the names of these policies, Green Tech's lack of product recall liability coverage has forestalled recovery on what it alleges to be the bulk of its costs. The kicker here is that Green Tech applied for and thought it had recall liability coverage. Green Tech thus alleges that Insure Idaho and Crouse negligently failed to procure the requested coverage.

In its complaint, Green Tech brought seven counts, but only three remain active in

---

[1] On February 26, 2018, the Court granted in part Liberty's motion to change venue by severing the claims against Liberty and transferring them to the Southern District of New York. Dkt. 39. Then in August of 2018, the Court stayed the case pending the conclusion of the civil action in the Southern District of New York. Dkt. 52. The Court lifted the stay on June 30, 2020. Dkt. 60.

this lawsuit: (1) broker malpractice/negligence, (2) broker malpractice/breach of contract, and (3) agency.

Except for the breach of contract claim, which is only asserted against Insure Idaho, each claim was originally asserted against Insure Idaho and Crouse. In light of the Southern District of New York's ruling in a suit between Green Tech and Liberty,[2] Green Tech is now no longer pursing its agency claim against Crouse. Dkt. 94, at 2. Green Tech has likewise abandoned its estoppel claim against Crouse. *Id.* These claims, however, remain active against Insure Idaho.

On July 1, 2022, Insure Idaho moved for partial summary judgment relating to damages. Dkt. 83. Four days later, Crouse moved for summary judgment on Green Tech's negligence claim. Dkt. 84. Also pending is Green Tech's motion to strike, filed on November 28, 2022.

### III. LEGAL STANDARD

#### A. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view the facts in the non-

---

[2] *Green Tech. Lighting Corp. v. Liberty Surplus Ins. Corp.*, 2020 WL 2036705 (S.D.N.Y. Apr. 28, 2020).

moving party's favor." *Id*. (cleaned up). To defeat a motion for summary judgment, the respondent need only present evidence on which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in his or her favor." *Id*. (cleaned up).

Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. ANALYSIS

The Court first addresses Crouse's motion for summary judgment before turning to Insure Idaho's motion for partial summary judgment. The Court then concludes by addressing Green Tech's motion to strike.

### A. Crouse's Motion for Summary Judgment (Dkt. 84)

Crouse seeks summary judgment on each claim asserted against it. Though Green Tech originally brought three claims against Crouse, it has dropped its agency and estoppel claims. Thus, the Court only addresses the parties' arguments about Crouse's alleged negligence. Ultimately, the Court finds that summary judgment in Crouse's favor is merited.

Under Idaho law, negligence consists of four elements: (1) a duty, recognized by

MEMORANDUM DECISION AND ORDER - 4

law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *First Bank of Lincoln v. Land Title of Nez Perce Cnty., Inc.*, 452 P.3d 835, 844 (Idaho 2019) (internal citation omitted). Crouse focuses on two of these elements—duty and breach, as well as the "general rule prohibiting the recovery of purely economic losses in all negligence actions." *Id.* at 845.

   *1. Duty*

   "The existence of a duty is a question of law." *Oswald v. Costco Wholesale Corp.*, 473 P.3d 809, 819 (Idaho 2020). "Self-evident in the formulation of [the negligence] elements is that a party cannot be held liable for negligence when there was no legal duty imposed under the circumstances." *Id.* Accordingly, the "analysis of any claim of negligence begins by identification and definition of a duty owed by defendant to plaintiff." *Id.* (cleaned up).

   On the whole, "every person has a general duty to use due or ordinary care not to injure others, to avoid injury to others by any agency set in operation by him, and to do his work, render services or use his property as to avoid such injury." *Id.* (cleaned up). Beyond this general duty, there usually exists "no affirmative duty to act, assist, or protect another absent unusual circumstances." *Coghlan v. Beta Theta Pi Fraternity*, 987 P.2d 300, 311 (Idaho 1999). The Idaho Supreme Court has identified two exceptions to this rule: "a special relationship or an assumed duty based on an undertaking." *First Bank*, 452 P.3d at 845.

a. General Duty

Crouse begins by tapping into a general duty vein. It asserts that it owes Green Tech no duty because it had no relationship, communication, or contract with Green Tech. In fact, Crouse claims Green Tech did not even know of its existence before the insurance claim was filed. Dkt. 84, at 12. Green Tech responds by raising a medical malpractice hypothetical to illustrate that it is not dispositive that the two parties never spoke and that it was not aware Crouse existed. Dkt. 94, at 5. Specifically, Green Tech argues that if a radiologist misread MRI data and thereby harmed a patient, that patient could file a suit even though they have never spoken and the patient does not know of the radiologist's existence. Dkt. 89, at 5. In its hypothetical, Green Tech reasons that a radiologist and patient have a special relationship,[3] giving rise to a duty on the part of the radiologist. It claims that the situation here is functionally identical. *Id.*

Crouse responds by stating that Green Tech wrongly compares this case to a medical malpractice case. Where medical malpractice cases are derived solely from tort law, Crouse contends that this case is derived from contract law. Dkt. 97, at 2. Crouse argues that "without the existence of a first-party contract between [Green Tech] and Insure Idaho, [Green Tech] would not have a negligence claim against any party in this case," among other things. *Id.* at 3. Crouse also points to Green Tech's sole relationship with Insure Idaho to service its insurance needs. *Id.* Because of this bilateral relationship, Crouse argues that

---

[3] The parties jumble the caselaw throughout the briefing, especially when it comes to "special relationships." As far as the caselaw goes, special relationships are not needed to establish general duties of care. Instead, they come into play as an exception to the general rule that an affirmative duty to act doesn't exist without a special relationship or an assumption of a duty based on an undertaking. *First Bank of Lincoln v. Land Title of Nez Perce Cnty., Inc.*, 452 P.3d 835, 845 (Idaho 2019).

only Insure Idaho knew Green Tech's business insurance needs. *Id.* On the other hand, Crouse alleges that Green Tech never made a request of Crouse to do anything on its behalf. *Id.* What's more, Crouse claims that Green Tech has provided no evidence that it had a contract or relationship with Crouse. *Id.* The only relationship Crouse had here was with Insure Idaho, so all of Crouse's actions were performed on Insure Idaho's behalf. *Id.* Because of this fact, Crouse argues that an indirect benefit to Green Tech does not create a duty incumbent upon Course. *Id.* For these reasons, Crouse asserts that it did not owe Green Tech a general duty of care.

Green Tech and Insure Idaho push back along the same lines. First, they claim that because Crouse is an insurance broker in Idaho, the state code and caselaw impose a standard of care. *See* Dkt. 90, at 3 (Insure Idaho) *and* Dkt. 94, at 6 (Green Tech). As such, Insure Idaho argues that Crouse has "a general obligation to use reasonable skill, care, and diligence to procure insurance requested by Insure Idaho and Green Tech." Dkt. 90, at 3. Likewise, Green Tech alleges that "insurance agents and brokers owe a duty of care to the insured apart from any duty which may be tied to a contract." Dkt. 94, at 6. These assertions, however, only apply to Green Tech's claims against Insure Idaho, given that it was the retail broker in direct privity. Dkt. 84-9, at 3. On the other hand, if Crouse owes any general duty as a broker, that duty is most likely owed to Insure Idaho alone, as Crouse's only direct client here. Dkt. 97-1, at 6.

Looking beyond general duty, Crouse argues that it does not owe Green Tech an affirmative duty because it does not have a special relationship with Green Tech and it has not assumed a duty based on an undertaking. Dkt. 84, at 13.

### b. Special Duty Exception

"Whether a special relationship exists is determined by evaluating the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled protection." *Baccus v. Ameripride Servs., Inc.*, 179 P.3d 309, 313 (Idaho 2008) (cleaned up). "A special relationship can have two separate but related aspects: (1) a special relation exists between the actor and a third person which imposes a duty upon the actor to control the third person's conduct, or (2) a special relation exists between the actor and the other which gives the other a right to protection." *Henrie v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 395 P.3d 824, 828 (Idaho 2017). So "having control over someone or a duty to protect that person is indicative of a special relationship." *Id.* at 829. And as the Idaho Supreme Court stated more recently, "the presence of a special relationship ordinarily depends on whether the defendant possessed a *superior* level of control or knowledge about the risk than the plaintiff." *Oswald*, 473 P.3d at 819 (cleaned up) (emphasis added).

Here, even viewing the facts in the light most favorable to Green Tech, it is undisputed that Crouse had no control over Green Tech. *See* Dkt. 84, at 14–15. As a term of art, "control" means the "direct or indirect power to govern the management and policies of a person or entity . . . by contract, or otherwise; the power or authority to manage, direct, or oversee." Control, *Black's Law Dictionary* (11th ed. 2019). Crouse could not bind Green Tech's coverage. Dkt. 84, at 14. Insure Idaho, on the other hand, could bind coverage as Green Tech's agent. *Id.* Moreover, as the wholesale broker, Crouse did not consult Green Tech on its specific needs. *Id.* As a result, Crouse did not have superior knowledge about

the risk than the plaintiff, notwithstanding it being the more sophisticated party, as far as brokering insurance goes. Therefore, at least between Crouse and Green Tech, control did not create a special relationship.

A duty to protect might suggest a special relationship between Crouse and Green Tech, which Green Tech and Insure Idaho both argue exists. To support this theory, Green Tech and Insure Idaho rely on *McAlvain v. General Ins. Co. of America*, 554 P.2d 955 (Idaho 1976). There, a plaintiff bought a store that had $45,000 of inventory. The realtor was also an insurance provider. At the time of the purchase, the business had $30,000 in coverage. *Id.* at 956. Soon after, the plaintiff asked the provider for sufficient insurance to cover the business, including inventory. *Id.* Given its position, the provider knew that the inventory was worth $45,000. *Id.* Even so, the provider only got coverage for $30,000. *Id.* A year later, the plaintiff learned of the provider's error and requested that the coverage be increased to $50,000. *Id.* at 956–57. The provider orally agreed but did not follow through. *Id.* at 957. A little while later, a fire destroyed the store, and though the inventory was valued at over $43,000, the policy only covered the $30,000 due to the provider's failure. *Id.*

The Idaho Supreme Court held that when an insurance agent receives a request to provide complete coverage and knows or should have known the amount of insurance necessary to obtain complete coverage, but thereafter underinsures the insured, that insurer can be held liable for negligence. *Id.* at 958. The court based its decision on the premise that a "person in the business of selling insurance holds himself out to the public as being experienced and knowledgeable in this complicated and specialized field." *Id.* "An

insurance agent performs a personal service for his client, in advising him about the kinds and extent of desired coverage and in choosing the appropriate insurance contract for the insured." *Id.* Because of that expertise, "[o]rdinarily, an insured will look to his insurance agent, relying, not unreasonably, on his expertise in placing his insurance problems in the agent's hands." *Id.* Thus, "[w]hen an insurance agent performs his services negligently, to the insured's injury, he should be held liable for that negligence just as would an attorney, architect, engineer, physician or any other professional who negligently performs personal services." *Id.*

Green Tech and Insure Idaho seek to analogize *McAlvain* to this case, but, as Crouse points out, they are distinguishable.[4] Unlike the *McAlvain* provider, which was the plaintiff's retail agent, Crouse is not Green Tech's retail agent; that would be Insure Idaho. Dkt. 97, at 4. Moreover, unlike the company in *McAlvain*, Crouse did not have knowledge of Green Tech's adequate coverage result—only Insure Idaho had knowledge of such. And even if Crouse did or could have had knowledge, Insure Idaho still was the only insurer with the authority to bind. Crouse could not have acted without Insure Idaho's imprimatur. On the other hand, Insure Idaho instructed Crouse to bind the coverage as provided in the binder, which specifically stated and identified that product recall liability was not covered. Dkt. 97, at 5.

Thus, the Court finds that there is not a special relationship between Green Tech and Crouse that would circumvent the no affirmative duty rule.

---

[4] *McAlvain* has also been used in the pure economic recovery line of cases, but the parties do not draw that distinction.

### c. Undertaking an Action Exception

The Court next turns to whether Crouse undertook an action that created an affirmative duty to Green Tech and finds that it did not.

"Even when an affirmative duty generally is not present, a legal duty may arise if one voluntarily undertakes to perform an act, having no prior duty to do so." *Baccus*, 179 P.3d at 313 (cleaned up). When this is the case, the person voluntarily undertaking the act has a duty to perform in a non-negligent manner. *Id.* Still, "when a party assumes a duty by voluntarily performing an act that the party had no duty to perform, the duty that arises is limited to the duty actually assumed." *Id.* (cleaned up). "Moreover, past voluntary acts do not entitle the benefited party to expect assistance on future occasions, at least in the absence of an express promise that future assistance will be forthcoming." *Id.* (cleaned up).

Green Tech and Insure Idaho both avow that Crouse assumed an affirmative duty, beyond a run-of-the-mill general duty. Green Tech points to an email sent to Insure Idaho by Crouse, accompanying the policy. Green Tech focuses on one line: "Thank you for the opportunity **to be of service to you and your client**; we are available to discuss any questions or concerns that you might have." Dkt. 93-5, at 100 (emphasis in original). Green Tech takes this apparently boilerplate line from a form letter and suggests that, by including it, Crouse intended to be of service to Green Tech in addition to Insure Idaho. Dkt. 89, at 9. Green Tech further argues that by "acknowledging both Insure Idaho and [Green Tech] were in mind when [Crouse] was conducting its business as a professional organization, Crouse demonstrated that it had to take on a duty to [Green Tech]." *Id.* But this argument is not persuasive.

Crouse's form letter was solely addressed to Insure Idaho: its only client in the matter. Green Tech also neglects important elements of the letter, which instructed Insure Idaho to "review the enclosed [policy] and advise as to any discrepancies." Dkt. 93-5, at 100. What's more, as Crouse points out, "the letter does not claim to provide or presume to state that the coverage was an adequate coverage for [Green Tech's] business needs." Dkt. 97, at 6. This letter is not a smoking gun, as Green Tech suggests. In fact, it does the opposite. Looking to this letter, summary judgment in Crouse's favor becomes a more tenable outcome.

Still, Green Tech argues that Crouse undertook a duty with more than just the letter. Specifically, Green Tech cites *Featherston By & Through Featherston v. Allstate Ins. Co.*, 875 P.2d 937, 938 (Idaho 1994). There, the plaintiff contacted an Allstate agent to ask about transferring his policy to Allstate. *Id.* at 841. The plaintiff requested a premium estimate for an Allstate policy with the same coverage he already had. *Id.* Though his old policy included underinsured motorist coverage, Allstate did not offer the same. *Id.* The agent failed to inform the plaintiff. *Id.* Green Tech uses this case to show that Crouse assumed a duty because it was working as an insurer for Green Tech. Dkt. 89, at 10. But this case is distinguishable.

Crouse persuasively points out that, similar to *McAlvain*, *Featherston* relies on the existence of a first party contract between a retail insurance agent, who was an agent for the insurer. Dkt. 97, at 7. Further, in applying liability to the insurer, the *Featherston* court focuses on the fact that the retail agent was an agent acting with authority from the insurer. *Id.* But here, Green Tech has conceded that Crouse was not an agent. Moreover, Green

Tech offers no evidence that Insure Idaho was Crouse's agent. Thus, this case fails to support Green Tech's assertion that Crouse undertook a duty.

Insure Idaho, on the other hand, proffers a plausible point that Crouse undertook an affirmative duty on Green Tech's behalf. To support its argument, Insure Idaho relies on three cases. First, it turns to *Baccus*, a case in which the Idaho Supreme Court found that a company assumed a duty because it previously undertook to perform primarily safety-related action. 179 P.3d at 314. In that case, a company contracted with another to provide floormats to prevent customers from slipping. The court held that the company could be liable because it assumed a duty of care to foreseeable parties by promising to place the mats but failing to do so. *Id.* Thus, it was reasonably foreseeable that the plaintiff slipped because of the company's failure, so it could be held liable, even though the parties weren't in privity.

Crouse believes *Baccus* is distinguishable. They argue that the *Baccus* court based its decision on whether a plaintiff would be left without a remedy simply because the company had duties under a contract to which the plaintiff was not a party. Dkt. 98, at 4. In other words, the company was under a legal duty to prevent foreseeable harm once it promised to place mats, and it could not immunize itself from this duty by entering a contract with someone else. *Baccus*, 179 P.3d at 315. Here, however, Green Tech is not left without a remedy. It is suing Insure Idaho, the entity it had a relationship with. Moreover, Crouse did not contract with Insure Idaho to skirt any duty, nor to assume a duty toward Green Tech.

Insure Idaho next points to *Cumis Ins. Soc'y, Inc. v. Massey*, 318 P.3d 932 (Idaho

2014). There, the court found that an appraiser who negligently prepared an appraisal for one client owed a duty to non-clients because the appraiser certified in its appraisal that borrowers and lenders could rely on its work. *Id.* at 938. By certifying the underlying appraisal, the Idaho Supreme Court held the appraiser assumed a duty of care to those whom he expressly identified as being able to rely on the report. *Id.* But that was not the case here. As Crouse convincingly argues, it did not certify its work—in fact it specifically instructed Insure Idaho to "review the enclosed and advise as to any discrepancies." Dkt. 97, at 4 (quoting Dkt. 93-5, at 100). Further, Insure Idaho has not provided evidence that it notified Crouse of any discrepancies, and it is undisputed that Insure Idaho instructed Crouse to bind the policy on Green Tech's behalf. *Id.* at 5.

The last case Insure Idaho relies on to support its point is *Harrigfeld v. Hancock*, 90 P.3d 884 (Idaho 2004). The *Harrigfeld* court held that an attorney who negligent drafted a will, improperly revoking two codicils, owed a duty of care to the non-client beneficiaries. *Id.* at 888. The court reached its conclusion, in part, because it found "sufficient moral blame attached to the negligent preparation or execution of testamentary instruments to impose liability." *Id.* The *Harrigfeld* court also hoped that imposing a duty would prevent future harm by "creating an incentive to prepare such instruments carefully." *Id.* Because of Crouse's alleged mistake, Insure Idaho argues a duty should be imposed to prevent future harm. Dkt. 90, at 9. By contrast, Crouse contends that *Harrigfeld* does not apply because it did not draft the policy, unlike the attorney who drafted the will and revoked the codicils. Dkt. 98, at 5.

Putting each of these cases together, Insure Idaho maintains that there are few

instances in which Crouse undertook an additional action creating an affirmative duty. Specifically, Insure Idaho claims Crouse undertook an additional duty of care by "prematurely"[5] reaching out to Liberty "on November 25, 2014, to receive a quote to renew Plaintiff's coverage as it had previously existed." Dkt. 90, at 5.

It is undisputed that Crouse voluntarily reached out to Liberty to receive a quote based on Green Tech's previous coverage in an effort to prevent a lapse in coverage. Dkt. 84-31, at 6–7. Assuming this is the type of action that imposes an affirmative duty, it is more limited than Insure Idaho suggests. For one thing, the action undertaken was asking for a quote based on the previous coverage, which only needed to be done non-negligently. *Baccus*, 179 P.3d at 313. No evidence suggests that Crouse was negligent in asking for this quote, especially because none of its actions were binding on Green Tech, meaning that it was not foreseeable that voluntarily requesting a quote would result in harm. Further, if Crouse assumed a duty by requesting a quote, that duty was limited to requesting a quote in a non-negligent manner. *Id.*

Insure Idaho tries to protract any affirmative duty Crouse may have had beyond the initial undertaking of requesting a quote. This protraction is inconsistent with the caselaw. "Past voluntary acts do not entitle the benefited party to expect assistance on future occasions, at least in the absence of an express promise that future assistance will be forthcoming." *Baccus*, 179 P.3d at 313 (cleaned up). Any future assistance stemmed from

---

[5] Insure Idaho says Crouse reached out prematurely. Though Crouse did reach out to Liberty before the policy expired, based on emails in the record, it might have been industry practice to do so. What's more, the emails suggest that Crouse could not get ahold of Insure Idaho and the latter was late in getting information to Crouse. *See* Dkt. 84-26, at 25.

the contractual relationship between Crouse and Insure Idaho, which is not a specific undertaking on Green Tech's behalf. *See id.* As such, Crouse requesting a quote was not a voluntary action triggering an exception to the no affirmative duty rule.

Insure Idaho seeks to apply the exception beyond Crouse's voluntary action of asking for a quote. The day after Crouse reached out to Liberty for quote info, Insure Idaho sent Crouse Green Tech's application. Unlike the previous year—the data Liberty first quoted—Green Tech applied for recall liability coverage in the application. Dkt. 90, at 5. Though Crouse forwarded the completed applications to Liberty, it did not follow-up or seek a quote for the new recall liability coverage. Dkt. 90, at 6. Insure Idaho alleges that Crouse's limited duty stemming from the quote obligated Crouse to follow-up and seek a new quote, but Crouse argues that it had no responsibility to do so, and it even disclaimed that the information in the binder required Insure Idaho's verification and approval.

Insure Idaho goes even further by arguing that the limited affirmative duty arising from Crouse requesting a quote in November 2014 continued into November 2015,[6] during the next enrollment season. Dkt. 90, at 6. In this instance, Liberty sent Crouse a quote based on the previous year's coverage.[7] Dkt. 84-31, at 7. After the exchange of several emails requesting information, Crouse forwarded the quote to Insure Idaho. The quote indicated that product recall liability coverage was not included. *Id.* at 9. As before, Crouse

---

[6] At times, Insure Idaho seems to fold its affirmative duty reasoning into a general liability argument. Insure Idaho even argues that Crouse voluntarily undertook a duty to provide Green Tech with insurance, but this falls under a general liability theory. Dkt. 90, at 6. This argument has already been dispatched.

[7] The previous year's coverage did not include the requested product recall liability policy. Also, it is unclear if 2015 application included a field where product recall liability could even be selected. Dkt. 90, at 7.

disclaimed that Insure Idaho needed to verify that the coverage for Insure Idaho's client was correct. Ultimately, Insure Idaho instructed Crouse to bind the coverage. Dkt. 84-33, at 2.

Insure Idaho points to these events to show that Crouse undertook an action and owed an affirmative duty to Green Tech. But again, the only voluntary act that Crouse undertook on Green Tech's behalf[8] was requesting coverage in 2014. That limited assumed affirmative duty would not carry on more than a year later.

Thus, both Green Tech and Insure Idaho have failed to show that Crouse undertook a duty creating an exception to the no affirmative duty rule. Therefore, Crouse did not owe an affirmative duty directly to Green Tech, so there cannot have been a breach.

### 2. Pure Economic Loss Rule

Even if the Court were to find that Crouse owed a duty to Green Tech—whether a general or an assumed affirmative duty—and breached that duty, the pure economic loss rule would bar recovery because Green Tech suffered no personal injuries nor injuries to property. The Supreme Court of Idaho adheres to the "general rule prohibiting the recovery of purely economic losses in all negligence actions." *First Bank*, 452 P.3d at 844–45 (internal citations omitted). This judicially created doctrine exists because there is typically no duty to prevent economic loss to another. *Wallace v. Heath*, 479 P.3d 155, 164 n.1 (Idaho 2021). There are two[9] exceptions to the pure economic loss rule: "(1) where a special

---

[8] This was undertaken solely on behalf of Crouse's own client, Insure Idaho.

[9] The Idaho Supreme Court most recently recognized two exceptions, *Wallace v. Heath*, 479 P.3d 155, 164 n.1 (Idaho 2021). At times, however, it also said there were three exceptions. *See First Bank*, 452 P.3d at 845. For present purposes, the Court will only analyze the two consistent factors because the additional factor "when the economic loss is parasitic to an injury to a person or property" does not apply here.

relationship exists between the parties,[10] or (2) where unique circumstances require a reallocation of the risk." *Id.* (internal citation omitted).

As to the first exception, "a special relationship exists where the relationship between the parties is such that it would be equitable to impose such a duty." *Id.* (cleaned up). This exception is extremely narrow and only applies in limited circumstances. *Aardema v. U.S. Dairy Sys., Inc.*, 215 P.3d 505, 512 (Idaho 2009). As such, the Idaho Supreme Court has only found a special relationship in two situations: (1) where a professional or quasi-professional performs personal services, or (2) where an entity holds itself out to the public as having expertise regarding a specialized function, and by so doing, knowingly induces reliance on its performance of that function. *Id.* (cleaned up).

Although it is not a pure economic loss case, the Idaho Supreme Court has relied on *McAlvain* in looking at situations where a professional or quasi-professional performs personal services. As already discussed above, Crouse is a professional organization that provides personal services. But for the same reasons set forth above, *McAlvain* is not dispositive in creating a special relationship between Crouse and Green Tech, even in the economic recovery rule vein. Again, Crouse provided its services for Insure Idaho alone.

Turning to situations where an entity holds itself out to the public as having expertise regarding a specialized function, and by so doing, knowingly induces reliance on its performance of that function, the Court also finds that there was no special relationship

---

[10] As mentioned above, throughout their arguments, the parties conflated the definition of "special relationship" as an exception in the no affirmative duty rule with "special relationship" as an exception to the pure economic loss rule.

between Crouse and Green Tech. The Idaho Supreme Court addressed this type of situation in *Blahd v. Richard B. Smith, Inc.*, 108 P.3d 996, 1001 (Idaho 2004) (citing *Duffin v. Idaho Crop Imp. Ass'n*, 895 P.2d 1195, 1201 (Idaho 1995)).

As the *Blahd* court explained, *Duffin* involved a crop improvement association that was the only entity in Idaho authorized to certify seed potatoes. The association held itself out to the public as having expertise in seed certification and induced reliance on that expertise. *Id.* An inspection service also checked seed for diseases. A farmer relied on the crop association in buying the certified seed but later found out it was defective. The farmer sued both the crop improvement organization and the inspection service. The court found a special relationship existed between the farmer and the crop improvement association because the association engaged in a marking campaign to induce reliance by purchases on the fact that the seed had been certified. *Id.* On the other hand, the *Duffin* court found no evidence in the record to conclude that the inspection service had sought to induce reliance on the part of the farmer. *Id.* Therefore, the inspection service did not "occupy a special relationship vis-à-vis those purchasers." *Duffin*, 895 P.2d at 1201. Accordingly, the pure economic loss rule applied.

Here, Insure Idaho is like the crop improvement association. It had a direct relationship and induced Green Tech to rely on its expertise. On the other hand, Crouse did not induce Green Tech to rely on Crouse's services. In fact, as a wholesale broker, Crouse does not provide services to the general public. Dkt. 84-2, at ¶ 2. Moreover, Crouse was selected by Insure Idaho, and Green Tech had no knowledge of Crouse's existence. Dkt. 84-19, at 3–4. Because Crouse did not hold itself out to Green Tech as having specific

expertise, it did not induce Green Tech to rely on its performance. For this reason, the special relationship exception to the economic loss rule does not apply.

As to the second main exception to the economic loss rule, where unique circumstances require reallocating the risk, the Court again reaches the same conclusion. "Although the Idaho Supreme Court has recognized the existence of the unique circumstances exception to the economic loss rule, it has never applied the exception." *Blahd*, 108 P.3d at 1002. For example, the Idaho Supreme Court held that the "certification of seed potatoes is not a 'unique circumstance' requiring a re-allocation of the risk." *Id.* (citing *Duffin*, 895 P.2d at 1200–01). The court likewise stated that "the purchase of a residential house is an everyday occurrence and does not create the type of unique circumstances required to justify a different allocation of the risk." *Id.*

Because of the scant analysis on the unique circumstances exception, the Court looks to the few examples from the Idaho Supreme Court and finds that brokering insurance, especially in the commercial context, is not tantamount to the type of unique circumstance that would circumvent the pure economic loss rule.

Accordingly, because neither exception to the rule exists, even if Crouse owed Green Tech a duty and breached it, Crouse could not be held liable because of the pure economic loss rule.

For all of these reasons, the Court GRANTS Crouse's Motion for Summary Judgment (Dkt. 84).

### B. Insure Idaho's Motion for Partial Summary Judgment (Dkt. 83)

Insure Idaho seeks this Court's conclusion about damages on three fronts: (1) Green

Tech's damages should be no higher than the policy limit of the originally requested but unobtained recall liability policy with Liberty; (2) Green Tech should be prohibited from recovering the costs incurred in shipping and storing its products, the liquidated damages from the sale of its products, and the Delta Millennium Incorporated Recall Program costs, because Green Tech held the necessary recall expense policy to recover those damages; and (3) Green Tech should be precluded from recovering those damages as they would not have been covered under the recall liability policy. Dkt. 95, at 1–2.

To reach these conclusions, the Court, sitting in diversity jurisdiction, must interpret the relevant contract provisions under Idaho substantive law. *Am. Triticale, Inc. v. Nytco Servs. Inc.*, 664 F.2d 1136, 1141 (9th Cir. 1981) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Per Idaho law, when an insurance policy has language that "is clear and unambiguous, coverage must be determined as a matter of law, according to the plain meaning of the words used." *Farm Bureau Mut. Ins. Co. v. Eisenman*, 286 P.3d 185, 188 (Idaho 2012). In interpreting an insurance policy, Idaho courts look to the plain meaning of the words to determine if there are any ambiguities. *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins.*, 115 P.3d 751, 754 (Idaho 2005). A provision within an insurance policy is ambiguous if "it is reasonably subject to conflicting interpretations." *North Pac. Ins. Co. v. Mai*, 939 P.2d 570, 572 (Idaho 1997) (citing *City of Boise v. Planet Ins. Co.*, 878 P.2d 750, 754 (1994)). Whether a contract is ambiguous is a question of law. *Trinity Universal Ins. Co. v. Kirsling*, 73 P.3d 102, 105 (Idaho 2003). As the Idaho Supreme Court has explained:

> To determine if an insurance policy is ambiguous, the general rules of contract law are applied subject to certain special canons of construction. These rules include looking at the plain language of the policy and reading the provisions within the context in which they occur in the policy. Additionally, unless contrary intent is shown, common, non-technical words are given the meaning applied by laymen in daily usage—as opposed to the meaning derived from legal usage—in order to effectuate the intent of the parties.

*Scout, LLC v. Truck Ins. Exch.*, 434 P.3d 197, 204 (Idaho 2019) (cleaned up). The burden is on the insurer to use clear and precise language if it desires to restrict the scope of its coverage. *Id.* If a policy term or provision is ambiguous, it is to be construed liberally, in favor of recovery, with all ambiguities being resolved against the insurer. *Id.* Ambiguities are resolved against the insurer because "insurance policies are contracts of adhesion, not subject to negotiation between the parties." *Id.* (citing *Moss v. Mid-Am. Fire & Marine Ins. Co.*, 647 P.2d 754, 756 (Idaho 1982)).

The Court now considers each part of Insure Idaho's Motion in turn.

*1. Limiting Damages to the Requested Recall Liability Policy*

Insure Idaho argues that any award of damages against itself should be limited to those compensatory damages that would have been covered under the product recall liability coverage Green Tech intended to purchase.[11] Dkt. 83, at 6. Insure Idaho further alleges that Green Tech is attempting to recover damages far beyond the harm Green Tech suffered due to Insure Idaho's alleged failure to procure the policy. *Id.* Moreover, Insure

---

[11] In a two-page filing, Crouse joins Insure Idaho's motion and requests that the Court conclude as a matter of law that Green Tech's damage claims are limited to only those damages that are in fact compensatory under the product recall inability insurance policy Green Tech claims it should have had at the time of the recall. Dkt. 85, at 2. Crouse likewise joins Insure Idaho in asking that any damages awarded to Green Tech be limited to the million-dollar limit in the policy. *Id.*

Idaho claims that Green Tech is instead trying to have its costs from the recall covered as well. *Id.* This attempt by Green Tech, Insure Idaho claims, violates the "fundamental principle of damages, [which] is to restore the injured party, as nearly as possible, to the position he would have been in had it not been for the wrong of the other party." *Id.* (cleaned up) (quoting *United States v. Hatahley*, 257 F.2d 920, 923 (10th Cir. 1958)).

To support its stance, Insure Idaho cites a string of parentheticals from courts outside of Idaho suggesting that proper measure of damages for an insurance agent's failure to procure insurance is limited to the amount that would have been due had a policy been procured. *Id.* (citing 49 Causes of Action 2d 1 (Nov. 2022 update) (collecting cases) (finding that the "majority of courts have found that an agent or broker is liable for all proximately caused damages up to the amount that the insurer would have had to pay the client had the desired insurance been obtained."). Though this collection of cases demonstrates that many courts around the country cap damages in these types of actions to the amount of the requested policy, Insure Idaho acknowledges that little caselaw in Idaho exists governing such a dispute. Dkt. 83, at 7.

In light of this dearth, Insure Idaho asks the Court to find *Scott v. Conner*—the decision of a Texas appellate court—persuasive. 403 S.W.2d 453 (Tex. Civ. App. 1966). While *Scott* provides sound reasoning, in light of *Erie*, the Court declines to consider a Texas appellate court decision in an area governed by Idaho substantive law. Instead, the Court looks to where the Idaho Supreme Court has employed reasoning similar to the *Scott* court. Insure Idaho suggests *Keller Lorenz Co. v. Ins. Assocs. Corp.*, 570 P.2d 1366 (Idaho 1977) is such a case.

Though not directly on point, *Keller* helps explain how the Idaho Supreme Court might have decided this case. There, the court limited the damages to what would have been covered had the plaintiff been properly insured. *See id.* at 1373. Insure Idaho argues that *Keller* illustrates "Idaho precedent for limiting the damages associated with an insurer's failure to procure insurance, be it in contract or tort, to what would have been due had a plaintiff be properly insured." Dkt. 83, at 4.

Insure Idaho also offers a few parentheticals that suggest the same: *Truck Ins. Exch. v. Bishara*, 916 P.2d 1275, 1278 (Idaho 1996) ("An insurer is under a duty to exercise good faith in considering offers to compromise an injured party's claim against the insured for an amount within the insured's policy limits."); *Wallace v. Hartford Fire Ins. Co.*, 174 P. 1009, 1010 (Idaho 1918) (Budge, C.J., concurring) ("If there were a contract of insurance, the action would be upon the contract, and the question of negligence would not be involved; the measure of damages, however, would be the same."); *Norco Windows, Inc. v. Hartford Cas. Ins. Co.*, 2007 WL 9751864, at *3 (D. Idaho Nov. 6, 2007) (quoting *Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440, 447 (Idaho Ct. App. 1984) ("[T]he purpose of awarding damages for breach of contract is to fully recompense the nonbreaching party for its losses sustained because of the breach, not to punish the breaching party.") Dkt. 83, at 10–11.

Throughout much of its response, Green Tech frames the motion in the wrong light. It cites caselaw that focuses on the merits of its claims, rather than caselaw directly touching on the issue of damages—the only issue Insure Idaho's motion concerns. Green Tech relies on three cases (*McAlvain*, *Featherston*, and *Hartford Fire*) that support its

negligence cause of action against Insure Idaho, but they do not touch on the damages issue. *McAlvain* and *Featherston* were analyzed in section A. And the relevant material from *Hartford Fire* is cited several paragraphs above. For brevity's sake, they are not discussed further. The Court finds that they do not address whether tort damages in insurance contract disputes can be capped at the limit of the requested policy.

Green Tech did cite one case directly about damages, *White v. Unigard Mut. Ins. Co.*, 730 P.2d 1014, 1017 (Idaho 1986). There, the Idaho Supreme Court held that "[a]n action in tort provides a remedy for harm done to insured though no breach of [a contract] has occurred and where contract damages fail to adequately compensate insureds." *Id.* at 1017. Still, *White* is not in the right ballpark. As Insure Idaho persuasively points out, *White* is materially distinct from the matter at hand because it involved an insurance agent who acted unreasonably and in bad faith.[12] Dkt. 95, at 5 (citing *White*, 730 P.2d at 1016). Because of the bad faith, the *White* court imposed broad damages because of agent's bad faith, as well as to incentivize settlement. *See id.* (collecting cases in footnotes). Unlike the situation in *White*, there is no bad faith here.[13]

Beyond this, Green Tech has offered no cases to defeat Insure Idaho's motion asking this Court to cap damages at the intended policy limit. So, as a matter of law, Insure Idaho is entitled to partial summary judgment on this point. The Court finds that the proper

---

[12] The Idaho Supreme Court "first defined the tort of bad faith in the insurance context in *White*." *Selkirk Seed Co. v. State Ins. Fund*, 22 P.3d 1028, 1031 (Idaho 2000).

[13] For this reason, *White* does not apply. *Id.* at 1031 ("*White* and its progeny specifically provide that an independent action in tort arises only where the insured can show that the insurer intentionally and unreasonably denied or withheld payment and as a result of the insurer's conduct the plaintiff was harmed in a way not fully compensable by contract damages.").

measure of damages is what Green Tech would have been entitled to had it held the Liberty recall liability coverage.

### 2. Barring Damages for Costs Associated with the Recall that were Covered

Insure Idaho next argues that Green Tech should be barred from recovering what it failed to recover from its recall expense policy through Liberty. Dkt. 83-1, at 11. Specifically, Insure Idaho claims that Green Tech is seeking damages not proximately caused by Insure Idaho's alleged failure to procure recall liability coverage. *Id.* at 11, 14.

It is undisputed that Insure Idaho procured and Green Tech received $3,000,000 in recall expense coverage from Liberty. The policy is as follows:

> **Product recall expense** means any of the following reasonable and necessary costs, provided such costs are incurred during the 12 month period commencing on the first day you become aware of the applicable **covered incident**:
> 1. costs to notify others of such **covered incident**, including but not limited to print, radio, television and internet notifications;
> 2. costs to recover **your product(s)** back to you from any purchaser, distributor, or user including handling charges;
> 3. costs to dispose of or destroy **your product(s)**, less any salvage or scrap value recovery, but only to the extent such disposal or destruction exceeds your standard disposal or destruction methods and is necessary to avoid bodily injury or property damage;
> 4. costs to rent additional temporary warehouse or storage space;
> 5. costs to utilize personnel other than **your** employees to assist with such **covered incident**
> 6. costs for wages including overtime if any paid to **your** non-exempt hourly regular employees for work devoted exclusively to such **covered incident**; and
> 7. costs incurred by such personnel and/or **your** such employees, including without limitation transportation and accommodations costs, in connection with such **covered incident**.

Dkt. 1, ¶ 36 (emphasis in original). Put in simpler terms, this policy covered Green Tech's costs to notify others of the recall, to recover the defective products, to destroy the defective

products, for warehouse and storage space, and to obtain personnel to assist with the recall. Contrastively, the unobtained recall liability policy covered "any sums that you become legally obligated to pay as compensatory damages and your defense costs resulting from the investigation, negotiation, settlement or defense of a claim or suit." Dkt. 83-4, at 14.

Arguing that the provided policy covered such expenses, Insure Idaho asks the Court to preclude Green Tech from recovering (1) the costs of retaining the company hired to facilitate the recall, (2) the costs incurred in the shipping and handling associated with moving the recalled light bulbs to warehouses, (3) the fees associated with those warehouses, and (4) the costs associated with the alleged loss due to the liquification of Green Tech's products. Dkt. 95, at 6. The Court considers each of them in turn.

Green Tech hired and retained DMI to facilitate the recall and now seeks $42,277.83 in damages for this cost. *See* Dkt. 83-1, at 14. Insure Idaho argues that this cost falls under the product recall expense policy that Insure Idaho procured. Specifically, subsection five of the policy covers "costs to utilize personnel other than [Green Tech] employees to assist with such covered incident." Dkt. 1, ¶ 36. As a matter of Idaho law, the Court finds that the recall expense policy unambiguously covered Green Tech's costs associated with hiring and retaining DMI. The Court likewise finds that the $185,571.59 Green Tech incurred in shipping and handling associated with moving the recalled light bulbs to warehouses and the fees associated with those warehouses were expressly covered under the recall expense

policy per subsections two[14] and four.[15] Lastly, the Court also finds that the $139,183.71 claimed liquidated damages arising from a warehouse selling Green Tech's products to satisfy the storage costs was also covered by the provided policy.

The Court makes these determinations by looking at the policy's unambiguous language. These costs would have been covered by the policy provided by Insure Idaho and were not proximately caused by Insure Idaho's alleged failure to procure the recall liability policy. It is as much a mystery to this Court, as it was to the Southern District of New York, why Green Tech never filed a claim for these expenses. *See Green Tech. Lighting Corp. v. Liberty Surplus Ins. Corp.*, 2020 WL 2036705, at *6 n.3 (S.D.N.Y. Apr. 28, 2020). Regardless, as a matter of law, Green Tech cannot now pin these costs on Insure Idaho because it delivered what Green Tech requested, at least as far as the recall expense policy goes.

### 3. Costs Associated with Recall Not Covered by Requested Recall Liability Policy

Next, Insure Idaho requests that the Court find that Green Tech is barred from recovering costs that would not have been covered under the unobtained recall liability policy. Specifically, Insure Idaho argues $874,473 in costs associated with the liquidation of Green Tech's products as not being recoverable under the unobtained recall liability policy. Dkt. 83-1, at 15.

The requested recall liability policy states:

**We** will, subject to the terms and conditions of this policy and excess of any

---

[14] Covering "costs to recover **your product(s)** back to you from any purchaser, distributor, or user including handling charges." Dkt. 1, ¶ 36 (emphasis in original).
[15] Covering "costs to rent additional temporary warehouse or storage space." Dkt. 1, 36.

applicable self-insured retention, pay on your behalf the **product recall liability damage** resulting directly from a **covered incident**, provided that such **covered incident** takes place in the **coverage territory**, and the discovery or the initial notification to us or general publication of such **covered incident** takes place during the policy period.

Dkt. 83-1, at 15 (emphasis in original). This agreement has several operative definitions as well. "Product liability damages" means "any sums that you become legally obligated to pay as compensatory damages and your defense costs resulting from the investigation, negotiation, settlement or defense of a claim or suit." Dkt. 89, at 14–15. "Claim" means "a written demand received by you seeking a remedy and alleging liability on your part for product liability damages as defined." *Id.* at 15. "Compensatory damages" means "the payment amount limited to actual injury or economic loss, and does not include liquidated, punitive or penalty damages." *Id.* "Covered incident" means "the recall, removal, recovery of possession or control, withdrawal or disposal of, or purposeful destruction of your product from a retailer because the product is dangerous." *Id.*

Pointing to these definitions, Insure Idaho asserts that the recall liability is an indemnity provision, and as such, for the policy to kick in, Green Tech needed to be sued. Green Tech, on the other hand, argues that a lawsuit is not required. Instead, Green Tech maintains that, even though the recall was done voluntarily after Menards reached out to them, the policy only requires a claim. They believe this was satisfied when Menards informed Green Tech of the problem and demanded that the light bulbs be recalled.

That said, the Court need not determine whether a suit must be filed to trigger the policy. The express language of the policy precludes liquidated damages. For this reason, Green Tech may not recover liquidated damages under the unobtained recall liability

policy. Beyond making this determination, as a matter of law, the Court does not wade into the amount of damages or other matters to be addressed at trial.

### C. Green Tech's Motion to Strike (Dkt. 101)

Two weeks before oral argument, Green Tech filed a Motion to Strike. In it, Green Tech argues that Crouse violated local rules by introducing new evidence in its reply brief. Specifically, Green Tech asks the Court to strike the second Declaration of Pam Quilici (Dkt. 97-1) and Section A-2 of Crouse's reply in its entirety. Green Tech argues that the Declaration contains several new factual statements and three new exhibits. Dkt. 102, at 2. Crouse responds by stating that it was responding to an argument first raised in Green Tech's response, so supplementing the briefing with another declaration was permissible. Insure Idaho joined Green Tech's motion.

Having reviewed the Motion and the response, the Court will not strike the second Quilici Declaration or Section A-2 of Crouse's reply. "The Federal Rules of Civil Procedure do not provide for a motion to strike documents or portions of documents other than pleadings." *Cmty. House, Inc. v. City of Boise*, 2014 WL 1247758, at *12 (D. Idaho Mar. 25, 2014) (citing *U.S. v. Crisp*, 190 F.R.D. 546, 550 (E.D. Cal. 1999)).

The Court will also not allow Green Tech to file a surreply. Leave to file surreply is discretionary, and district courts routinely deny motions for surreplies absent extraordinary circumstances. *See Hathaway v. Idaho Pac. Corp.*, 2020 WL 2858003, at *2 (D. Idaho June 2, 2020) (cleaned up) (collecting cases). Raising new issues or evidence in a reply brief can be an extraordinary circumstance. *Id.* When this happens, district courts may allow a surreply by the non-moving party to ensure it has a full and fair opportunity to brief

the issues in the case. *Id.* Still, surreplies—in any context—are "highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter." *J.R. Simplot Co. v. McCain Foods USA, Inc*., 2021 WL 4899465, at *2 (D. Idaho Oct. 20, 2021) (cleaned up).

The Court reaches its decision on striking and surreply for at least two reasons. First, to the extent the declaration and reply present new evidence, that evidence is not dispositive. The Court grants summary judgment without considering the new evidence. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). Further, because the Court need not consider that evidence, there is no reason for Green Tech to file a surreply. What's more, given the late hour at which Green Tech's Motion was filed, it seems to be merely a strategic effort to have the last word on the matter or a roadblock to this Court securing "the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

## V. CONCLUSION

A jury could find negligence here. At some point, someone messed up. Green Tech did not receive the insurance coverage it applied for. Still, as between Green Tech and Crouse, there was not negligence sufficient to impose legal liability. Further, even if Crouse were negligent in some way, the only duty owed was to Insure Idaho, its co-party. Surprisingly, however, Insure Idaho did not bring a crossclaim against Crouse. Even so, this case will go to a jury. It will not, however, include Crouse, and Green Tech, as a matter of law, will not be able to receive damages greater than what it would have received had the requested policy been in place.

MEMORANDUM DECISION AND ORDER - 31

## VI. ORDER

The Court HEREBY ORDERS:

1. Defendant Crouse's Motion for Summary Judgment (Dkt. 84) is GRANTED.

2. Defendant Insure Idaho's Motion for Partial Summary Judgment (Dkt. 83) is GRANTED.

3. Plaintiff Green Tech's Motion to Strike (Dkt. 101) is DENIED.

4. Within fourteen days of the date of this Order, the remaining parties shall submit their unavailable trial dates starting in January 2024. The Court will then enter a separate Trial Order that sets forth the trial date and other pretrial deadlines.

DATED: March 31, 2023

David C. Nye
Chief U.S. District Court Judge